UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

Civil Action No. 12-70-HRW

FRANCES ATKINS,                                                                                                                 PLAINTIFF,

v.             **MEMORANDUM OPINION AND ORDER**

GUARDIAN LIFE INSURANCE COMPANY OF AMERICA,         DEFENDANT.

This matter is before the Court upon the parties' cross Motions for Judgment as a Matter of Law [Docket No. 19 and 20]. The motions have been fully briefed by the parties [Docket Nos. 21, 22, 23, 24, 25 and 26]. The Court having reviewed the parties' briefs as well as the Administrative Record [Docket No. 15] finds that the Defendant is entitled to judgment as a matter of law.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit arises from Defendant Guardian Life Insurance Company of America's (hereinafter "GLIC') termination of Plaintiff's Frances Atkins' long-term disability benefits. Plaintiff seeks reinstatement of her benefits under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132. In addition to a reinstatement of her benefits, Plaintiff seeks an award of attorneys' fees and costs.

### A. The Plan

Plaintiff began working as a Family Youth Specialist at Specialized Alternatives for Family and Youth (hereinafter "SAFY") in July of 2004.. As a benefit of her employment, she

1

obtained long-term disability insurance coverage under a Guardian Group Insurance Plan sponsored by SAFY ("the Plan"). The Plan is insured and administered for purposes of claims adjudication by GLIC. The Plan expressly designates GLIC as the "Claims Fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims." [*See* Administrative Record (hereinafter "AR"), Docket No. 15 at 43]. The Plan also provides, "[w]e [GLIC] decide: (a) if you are eligible for this insurance; (b) if you meet the requirements for benefits to be paid; and © what benefits are to be paid by this plan." [AR 24].

The Plan offers monthly disability benefits equal to 60 percent of a participant"s "insured earnings," as defined by the Plan. [AR 29]. A participant is "disabled" if she has "physical, mental or emotional limits caused by a current sickness or injury" and as a result of those limits she "[is] not able to perform the major duties of [her] own occupation or any gainful work." [AR 37]. The "own occupation" definition of disability applies during the first twenty-four months of benefit payments; thereafter, the "any gainful work" or "any occupation" standard applies. *Id.* Upon a determination of disability by GLIC, benefits are payable following a ninety-day elimination period. [AR 23]. Plan benefits are offset by certain kinds of other income, such as workers" compensation benefits and Social Security disability benefits. [AR 101].

Generally, "any occupation" benefits are payable for as long as the disability continues, up to age 65. *Id.* Benefits terminate prior to age 65, if, among other things, the participant is no longer disabled or fails to provide "required current proof of loss." [AR 27].

"Special limitations" can also affect the maximum period for which benefits are payable.

2

For a disability due to mental or emotional conditions, the maximum payment period is twenty-four months. [ AR 28]. A twelve-month lifetime payment limit applies to "subjective disorders," defined as "a condition that cannot be proved using current clinical standards." *Id.*

The Plan also excludes disabilities due to a pre-existing condition until the participant has been actively employed by the plan sponsor for twenty-four months. [AR 105]. Pre-existing conditions are those for which the participant was treated during the six-month period immediately preceding the effective date of the participant"s coverage under the Plan. *Id.*

## B. The Accident

On December 10, 2004, Plaintiff was working on a case near Vanceburg, Kentucky. She left the foster home and was on her way to pick up some clothing for the child when she was struck, nearly head-on, by another vehicle. Her head struck the steering wheel and she was briefly rendered unconscious. She was transported by ambulance from the scene of the accident to Meadowview Medical Center and was released that day. That evening she experienced dizziness and nausea as well as neck and back pain. The next day she went to the Emergency Room at Kings Daughters Medical Center. X-rays revealed "mild frontal scalp soft tissue swelling." [AR 322]. She was released that day. On December 16, 2004, Plaintiff returned to King"s Daughters for a CT examination of her cervical spine, which revealed "[n]o evidence of post traumatic injury." [AR 321].

## C. Plaintiff's Application for Disability

GLIC received Plaintiff"s application for long-term disability benefits and supporting documentation on May 17, 2005. [AR 292-337]. According to the attending physician's statement Plaintiff"s diagnoses were "Displaced Cervical & lumbar Disc."; "Vestibulopathy";

3

and "Brain Concussion." [AR 300]. Her complaints were "severe neck & low back pain." *Id.*

GLIC requested medical records from Plaintiff's physicians. [AR 344-52]. GLIC also requested additional information from the Plaintiff, including a copy of an Independent Medical Evaluation ("IME") report relating to her workers" compensation claim. [AR 398]. In addition, in June 2005 GLIC"s claims specialist referred the file to Karen Walczer, R.N. for follow-up and further investigation with respect to the Plaintiff"s medical issues. [AR 128].

On July 19, 2005, GLIC paid Plaintiff four months worth of benefits ($5,968.00) "on an administrative basis to assist [her] during [GLIC"s continued] investigation" of her claim. [AR 584]. The payment was made under a reservation of rights and was based on Plaintiff"s conditions of displaced cervical and lumbar disc and concussion, which were not pre-existing conditions under the terms of the Plan. [AR 585]. GLIC referred the matter to its Special Investigation Unit to follow up on reports that Plaintiff was working at her husband's health food store instead of reporting for work at SAFY. [AR 580-82]. Monthly benefit payments were made to Plaintiff during GLIC's investigation.

Plaintiff continued to see Dr. Bansal for various complaints of back, neck, and knee pain, along with problems with concentration, memory, and dizziness, during the remaining months of 2005 and into 2006. [E.g., AR 662, 661, 660, 658-59, 656-57]. Dr. Bansal performed a nerve conduction study and electromyography on May 19, 2005. The report states: "[e]ssentially normal study; [t]here was no indication of any cervical radiculopathy or lumbosacral radiculopathy and there was no evidence of any myopathy or neuropathy from this study." [AR 654-55]. On November 22, 2005, Plaintiff was evaluated at Tri-State Otolaryngology for problems walking due to poor balance. [AR 527-28]. The evaluator found "no significant

4

evidence" to support a conclusion that Plaintiff's disequilibrium was due to "vestibular insult" and recommended physical therapy. [AR 528]. Plaintiff underwent an extensive neuropsychological examination which entailed visits on July 20, September 27, October 30, 2005, and January 17, 2006. [AR 608-31]. As this evaluation was conducted over an extended period of time, Plaintiff requested and GLIC gave her an extension of time for submitting information needed to complete the review of her claim. [AR 136-40]. Meanwhile, in December 2005 GLIC learned that the Plaintiff had been awarded Social Security disability benefits in January 2004 for depression, anxiety, and panic attacks. [AR 536].

By letter dated June 1, 2006, GLIC notified Plaintiff that she was eligible for Plan benefits. AR669-70. Such benefits were payable under the Plan's "own occupation" definition of disability. GLIC also determined that the Social Security disability benefits Plaintiff had been receiving since January 2004 were properly offset against benefits under the Plan and requested repayment of $2,970.82 in overpayments. [AR 676-77]. Plaintiff was not able to satisfy the overpayment in a lump sum, so GLIC began withholding installments from her monthly benefits. [AR 683].

**D. GLIC's Determination of Non-Eligibility for "Any Occupation" Benefits**

GLIC continued to monitor Plaintiff's condition, seeking information concerning her ongoing medical care and her own assessment of the effect of her symptoms on daily activities. [AR 698-70]. On October 31, 2006 and again on February 12, 2007, GLIC notified Plaintiff that effective March 11, 2007, the Plan's "any occupation" definition of disability would apply, such that benefits would continue if Plaintiff was "unable to perform the duties of

5

any occupation for which [she was] suited by education, training, or experience." [AR 714, 715]. It was not until September of 2007 that GLIC received the information necessary to complete its review; benefit payments continued in the meantime.

In connection with GLIC's review, Kevin Duncan, an independent functional capabilities therapist retained through United Review Services, Inc., the evaluated Plaintiff on August 2, 2007. He noted that her participation was self-limiting in seventeen out of twenty-one tasks. [AR 769]. Such performance indicates that it is likely that "psychosocial and/or motivational factors may be influencing physical performance." [AR 770]. Still, the functional capabilities evaluation ("FCE") report concluded that the Plaintiff's results "indicate the ability to function at the sedentary level of work at this time," which conclusion was consistent with a Physical Capabilities Evaluation completed by Dr. Bansal on April 26, 2007. [AR 769; AR 737-39]. GLIC forwarded a copy of the Mr. Duncan"s FCE report to Dr. Bansal for comment on August 23, 2007, and telephoned his office twice, but did not receive a response from the doctor. AR 172].

The medical information was also reviewed by a GLIC's rehabilitation specialist for purposes of performing a transferable skills assessment. [AR 787-825]. Taking into account Plaintiff's performance on the FCE and her education and professional experience, the analyst identified several viable employment options for the Plaintiff which were available in the

6

relevant geographic area, Northeast Kentucky, and which met the target wage, $11.86 per hour. [AR 787].

By letter dated September 11, 2007, GLIC advised the Plaintiff of its determination that she was not eligible for benefits under the Plan's any occupation standard. [AR 830-37]. Based on that evidence, GLIC concluded that the Plaintiff was not eligible for additional benefits under the terms of the Plan as of March 11, 2007 – the effective date of the "any occupation" standard. [AR 835]. GLIC nevertheless paid benefits through September 10, 2007 while expressly stating that such accommodation was not an admission of liability. *Id.* The September 11, 2007 letter also advised the Plaintiff of her right to appeal the adverse determination, described the information that should be provided in support of appeal, and enclosed a copy of the Plan's appeal procedures. [AR 835-37].

### E. Appeal of GLIC's Adverse Benefits Determination and Conditional Approval of the Claim Under the "Any Occupation" Standard

Plaintiff appealed GLIC's September 11, 2007 decision on March 7, 2008. [AR 839]. In support of the appeal, Plaintiff's counsel submitted a September 19, 2007 medical report from Dr. Bansal. AR 840-41. According to Dr. Bansal, "the patient at this time is totally disabled to be employed into any sustained gainful employment, even light duty work, even on a part-time basis because of symptoms of post concussive syndrome which has nothing to do with her chronic cervical, thoracic and lumbosacral sprain or other physical problems." [AR 841].

GLIC's claims representative referred the file to medical specialist Dawn Wright, R.N. [AR 178]. Ms. Wright reviewed the medical records in the file, with particular attention to the cognitive problems referenced by Dr. Bansal and others. [AR 179-85]. She noted that the FCE had demonstrated that Plaintiff was capable of working from a physical standpoint, but it was not clear that Plaintiff's cognitive status had been taken into account. [AR 184]. Ms. Wright concluded, "[i]t appears that medical supports the functional limitations and restrictions as set forth by Dr. Bansal for own and any occupation" and recommended a neuropysch IME "to gain an objective assessment of the claimant's functional limitations for any occ[upation] from a cognitive perspective." [AR 184-85].

On April 4, 2008, GLIC reversed its September 2007 decision and reinstated benefits as of September 11, 2007, subject to its right to continued investigation of the claim. [AR 847-48; AR 849].

### F. GLIC's Continued Investigation and Determination of Special Limitation

Through PsyBar, LLC, GLIC referred the file to an independent neuropsychologist, Nick A. DeFilippis, Ph.D., for a file review in July 2008. [AR 905-12]. Dr. DeFilippis responded to a number of questions posed by GLIC. His July 23, 2008 report is marked by repeated references to examining physicians' observations of possible malingering and conscious exaggeration of

8

symptoms. E.g., AR 910, 911, 912. He also discussed Plaintiff's history of drug and alcohol abuse (reportedly dating from 1981) and her continuous use of narcotic pain relievers and tranquilizers while being treated by Dr. Bansal following the December 2004 accident. [AR 909]. Dr. DeFilippis concluded that "the records do not document the presence of psychological or neuropsychological impairments in this claimant because of the lack of historical information and indications of her unreliability in reporting difficulties." [AR 912]. Among other things, he recommended that she "speak to a mental health care professional who can explain to her that she is showing signs of conscious exaggeration of problems and that there are many inconsistencies in her records." *Id.*

In accordance with this information, GLIC undertook to schedule a neuropsychological IME, again with the assistance of PsyBar. Efforts were made to identify a qualified neuropsychologist within a reasonable traveling distance from the Plaintiff's home without success. [AR 186, 191]. Finally, GLIC arranged for a neuropsychologist, J. Robert Yohman, Ph.D to conduct the testing. [AR 193]. The examination took place on December 18, 2008.

Dr. Yohman's observations and conclusions closely resembled those of Dr. Phifer in many respects. Dr. Yohman reported that the Plaintiff had arrived for the exam twenty-five minutes late "and immediately began crying and cursing the examiner, saying "[y]ou all have f----ed me over."" [AR 978]. Dr. Yohman, like Dr. Phifer, also concluded that several of the test results were invalid due to inconsistent or poor effort. [AR 986, 987-88, 989]. During the exam,

9

Plaintiff relayed her family history, stating that she had been both physically as well as sexually abused and had a history of drug and alcohol abuse. Dr. Yohman opined: "[t]here is no objective evidence of consequences of a traumatic brain injury. There is no evidence of a panic disorder. Her failure on specific effort measures, as well as other indicators of inconsistent or poor effort, makes the diagnosis of Malingering most appropriate. *Id.* He further concluded "[t]here are no limitations in the claimant"s ability to perform daily tasks now or in the future." [AR 991].

In furtherance of its investigation, GLIC sought a multi-disciplinary peer panel review from MLS National Medical Evaluation Services, Inc. ( hereinafter "MLS"), an independent medical review consultant. [AR 1209-1209]. This review was done by Dr. Applebaum who diagnosed Plaintiff as "malingering." He opined: "[t]here is no documentation of significant post-concussive syndrome except per the patient's subjective complaints of headaches and memory loss." [AR 1222].

GLIC then arranged for an psychological IME by Dr. Bobby Miller in on January 14, 2010. [AR 1323]. He diagnosed Plaintiff wit Dissociative Identity Disorder and Borderline Personality Disorder. Dr. Miller further explained that the origin of those conditions "is ritualistic childhood physical and sexual abuse perpetrated by her mentally ill mother." *Id.* He concluded that although she had recovered from her post-concussive disorder, the continues to meet diagnostic criteria for Postconcussive Disorder but her concussion allowed her personality to disintegrate." Her psychological limitation, according to Dr. Miller, "is that she is unable to contain her alter egos and her preferred personality state is abrasive, defensive, is not

intelligent and lacks education." [AR 1329]. With respect to the Plaintiff's ability to work, Dr. Miller noted that "Mrs. Atkins is currently working" on a daily basis at a business owned by her and her husband selling vitamins and nutritional supplements. *Id.* He also opined, however, that "[i]t is unlikely that she will work again as a mental health professional." [AR 1330]. On May 17, 2010, GLIC advised Plaintiff's attorney that it had "determined that Ms. Atkins is unable to return to work performing the major duties of any gainful occupation, due to a diagnosis of multiple personality disorder, which is a mental and/or emotional condition and not due to a physical condition." [AR 1363]. As such, effective May 11, 2010 Plaintiff's disability payments would be issued under the "Special Limitations" provisions of the Plan, specifically, the twenty-four month limitation for mental or emotional disabilities. *Id.* Accordingly, benefits would continue until May 11, 2012 and then terminate.

### G. Plaintiff's Appeal and GLIC's Final Decision

Plaintiff's appealed to no avail. The final decision of the Plan Administrator provided, in pertinent part:

> Based on the preponderance of medical evidence, the condition causing limitations and restrictions that may interfere with gainful work for Ms. Atkins is Dissociative Identity Disorder. This condition is considered a mental or emotional condition, therefore, falls under the Special Limitations provision of the plan which limits the maximum payment for such conditions to 24 months.
>
> At the conclusion of our investigation in 2010, Guardian made the determination to apply the Special Limitations provision as of the beginning of the next benefit payment period, or May 11, 2010. This decision was relayed to you in our May 17, 2010 letter. Therefore, the maximum payment period of 24 months will expire on May 10, 2012.

11

> Based upon our appeal review, we have determined that this decision is correct and in accordance with [the Plan].

[AR. 1414].

This lawsuit followed.

## II. STANDARD OF REVIEW

Where, as here, an ERISA plan grants the administrator discretionary authority to determine benefit eligibility, this Court reviews benefit denials or terminations under the arbitrary-and-capricious standard. *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 365 (6th Cir.2009). The administrator's decision will be upheld " if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence. "*Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir.2006) (*quoting Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)), *aff'd*, 554 U.S. 105 (2008). Review for arbitrariness or capriciousness "is the least demanding form of judicial review of administrative action.... When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry v. United Food & Commercial Workers Dist. Unions, 405 & 442*, 64 F.3d 238, 241 (6th Cir.1995) (citations and internal quotation marks omitted). This Court must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants." *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir.2004).

12

## III. ANALYSIS

There can be no doubt that the Plan's terms authorize limiting benefits to twenty-four months for mental/nervous disabilities. The Plan's "Special Limitations" section provides:

> We limit the maximum payment period, if you are disabled due to: (a) a mental or emotional condition; (b) drug or alcohol abuse; and ( c)a subjective disorder. . . . .
>
> > The maximum payment period for all periods of disability due to mental or emotional conditions or drug or alcohol dependence is 24 months. This is a combined maximum for all such conditions and all periods of disability.
>
> . . ...

"Mental or emotional conditions" include, but are not limited to, "(a) neurosis; (b)

psychoneurosis; ( c) psychosis; (d) psychopathy; and (e) any other mental or emotional disorder,

including those caused by chemical imbalance."

[AR 39].

In light of these provisions, the question becomes whether GLIC's classification of Plaintiff's disability as falling within the definition of mental or emotional conditions is supported by substantial evidence and resulted from a principled decision-making process. Plaintiff does not dispute the diagnoses of dissociative identity disorder and borderline personality disorder. Nor does she deny that these are mental / emotional, as opposed to physical, conditions. Nor does she question that the Plan unambiguously limits benefits for a mental / emotional condition to twenty-four months. Rather, in seeking reinstatement of benefits, Plaintiff maintains that the Plan's

13

Special Limitations provision does not apply to her because her limiting mental condition was triggered by the December 2004 car accident. However, there is evidence in the Administrative Record, for example, Dr. Miller's opinion, that her mental illness existed long before the accident and is, in fact, attributable to abuse she suffered as a child.

Indeed, Plaintiff acknowledges she suffered from psychological problems prior to the incident. As summarized by the Plaintiff, the argument is that "there is ample evidence in the record that the origin of Plaintiff's admitted disability is due to" physical injuries and impact, made more complex by the existence of mental problems." [Docket No. 22 at 3]. That statement reveals a misunderstanding of the nature of "arbitrary and capricious" judicial review. The issue is whether substantial evidence supports the administrator"s decision and not whether there is evidence that might support a different result. *See, e.g., Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004). Moreover, the Plaintiff bears the heavy burden of proof "to show not only disability, but that the decision was arbitrary and capricious." *Rochow v. Life Ins. Co. of Am.*, 482 F.3d 860, 865 (6thCir. 2007).

Moreover, it is clear from the record that the injuries resulting from the 2004 car accident were resolved as early as 2006. The injuries Plaintiff suffered were so minor that she was released from Meadowview Regional Medical Center the same day after x-rays revealed no broken bones. When she was examined the next day at King"s Daughters, all studies were essentially negative. There were no broken bones, no evidence of injury to the cervical spine, no abnormality with respect to the lumbar spine, normal studies of the chest and pelvis, and no acute intracranial hemorrhage was

14

found on a CT scan of the head. Plaintiff did have "[m]ild frontal scalp soft tissue swelling" – a small bump on her forehead. [AR 322]. As early as January 6, 2005, an independent examining physician concluded that "this claimant"s diagnosis referable to the automobile accident of 12/10/04 is resolved acute cervical and lumbar strains and contusion to both knees and resolved closed head injury." [AR 579].

Plaintiff relies on a discussion of the "physical" / "mental" distinction found in *Roubal v. Prudential Ins. Co. of Am.*, 2009 WL 2487978, Civil Action No. 3:08-cv-10-H (Aug. 14, 2009). *See* Doc. 24 at 5-6. The underlying facts of that case are described in an earlier opinion – *Roubal v. Prudential Ins. Co. of Am.*, 2009 WL 1034144, Civil Action No. 3:08-cv-10-H (Apr. 16, 2009). The plaintiff was injured in an automobile accident in March 1999 which necessitated a thirteen-day stay at the University of Louisville hospital. He returned to part-time work one month later; was briefly hospitalized and stopped working in December 1999; and had gall bladder surgery in February 2000. Prudential provided long-term disability benefits from June 8, 2000 to December 31, 2000 for reasons of the surgery and depression.

The plaintiff contended that Prudential should not have terminated his benefits in December 2000. *Id.* at *1. More specifically, the plaintiff claimed that he suffered from cognitive deficiencies and physical limitations as result of injuries sustained in the March 1999 accident. The court had no trouble in upholding Prudential's determination that the plaintiff was not precluded from performing his job due to physical limitations. *Id.* at *2. "The real issue here," the court noted, "concerns Plaintiff's neurological disabilities, which everyone agrees

15

comprise the most serious of his complaints." *Id.* at *3. On that issue, the court determined that Prudential's denial of disability benefits was arbitrary.

The results of two sets of neuropsychological tests confirmed the plaintiff's complaints of memory deficits and inefficient cognitive functioning. Both examiners concluded that the plaintiff "did not exaggerate his symptoms and put forth the appropriate effort." *Id.* at *5. Prudential, however, accepted the two file reviewers' conclusions that the medical records and testing results did not support a finding of disability due to cognitive disorder. The court found fault with Prudential's reliance on the non-examining physicians' objections to the treating doctors' findings:

> All of these objections essentially attack the reliability or credibility of Plaintiff and his doctors. A reviewing doctor, who never meets the patient, however, is not in a good position to determine a patient's credibility . . . . Likewise, an attack on a treating physician's reliability or credibility in regards to a diagnosis, is unfounded where the reviewing doctor has not at least talked to the treating physician and the patient. . . .
>
> [In short,] Prudential's reviewing doctors improperly discounted the findings of Plaintiff's doctors based on a credibility determination that the reviewing doctors were not in a position to make. In improperly discounting the findings of Plaintiff's doctors, Prudential arbitrarily denied benefits to Plaintiff.

*Id.* (citation and footnote omitted). Having found the Prudential's denial of benefits based on

cognitive deficiencies was arbitrary, the court went on to hold that the plaintiff *was* disabled on that basis. *Id.* at *6. The court then concluded that Prudential properly characterized the plaintiff's disability as falling within the plan's mental/nervous limitation. *Id.*

In the subsequent decision, the court revisited that last issue and determined that it could not conclude, as a matter of law, whether the plan's mental/nervous limitation applied. *Roubal*,

2009 WL 2487978, at *5. The passage from the opinion that is quoted in Plaintiff's brief reflects the court's analysis of the issue. In the court's view, "[c]ognitive disorders resulting from physical injury to the brain are exempt from the mental health limitation." *Id.* at *6. The court further stated, "[e]ven though the evidence suggests that a physical trauma to the brain may have caused diminished cognitive function, no fact finder has thoroughly reviewed the evidence to make such a determination." *Id.* In those circumstances, "remand to the plan administrator is appropriate to make such a review." *Id.*

The differences between the *Roubal* situation and the circumstances of this case are obvious. In *Roubal*, for example, the plaintiff's injuries from the accident were such that he was immediately flown to University of Louisville hospital and treated there for thirteen days. Plaintiff here was treated and released on the day of the accident, seen again the following day and a number of times shortly thereafter, and given a battery of tests, all of which were negative, as were radiological studies performed later. [AR 321-25, 528, 655, 1129, 1130, 1121-24].

In addition, in *Roubal*, the two examining neuropsychologist concluded that the plaintiff's complaints of memory deficit and inefficient cognitive functioning were supported by credible evidence, while two reviewing professionals retained by Prudential discounted those conclusions. In this case, Dr. Phifer, who examined the Plaintiff in 2005, noted evidence of "the deliberate simulation or exaggeration of illness of disability" and indications of "marked prominent contribution of non-organic factors to her pain report and/or behavior." [AR 629,

17

628]. Three years later when the Plaintiff was evaluated by Dr. Yohman, testing produced a primary diagnosis of malingering; "test results provided strong indications of three specific tests of poor or inconsistent effort"; and "there [was] no objective evidence of consequences of a traumatic brain injury." [AR 989]. Further, three independent reviewing professionals (DeFilippis, Applebaum, Carroll) did not find support in the record for functional impairment.

Moreover, Plaintiff's attempt to show a similarity between *Roubal* and this case by focusing on Dr. Miller's January 2010 report is unavailing. Dr. Miller was specifically asked to comment on whether Plaintiff's psychological limitations in functioning, if any, were "directly related" to her reported post-concussive syndrome. [AR 1327]. As the Plaintiff points out in her brief, Dr. Miller explained that the accident had triggered "psychic chaos" which "led to an abrupt and dramatic disintegration of [Plaintiff's] personality structure." [AR 1328]. But, according to Dr. Miller, Plaintiff had subsequently recovered from her post-concussive disorder and "has normal neurological function." [AR 1328]; *see also id.* at 1329 ("Clinically, [Plaintiff] did not manifest any overt or definable cognitive deficit from any psychiatric or neuropsychiatric origin.").

Thus, there is substantial credible evidence that the Plaintiff here does *not* have cognitive dysfunction as a result of a traumatic brain injury of lasting effect. Dr. Phifer observed strong indications that "non-organic factors" contributed to the her behavior in 2005. [AR 628]. Dr.

18

Yohman found "no objective evidence of consequences of traumatic brain injury" in December 2008. [AR 989]. He concluded "[t]here is no valid objective evidence for functional impairment or cognitive deficits in the medical records or in the 2005 or December 2008 neuropsychological exams." [AR 1031]. Dr. Miller also opined that Plaintiff had "normal neurological function" in January 2010. [AR 1328]. Unlike *Roubal*, this is *not* a situation in which ongoing cognitive dysfunction may have resulted from a traumatic brain injury.

Plaintiff also agues that GLIC's investigation of her claim was a result-oriented process which was, by deliberate design, to result in an adverse determination. The Court disagrees. During the course of the six-plus-year investigation of Plaintiff"s claim for benefits, Plaintiff was examined by four independent professionals (Drs. Sheridan, Phifer, Yohman, and Miller) and her medical records were peer reviewed by three different independent professionals (Drs. DeFilippis, Applebaum, and Carroll). Five of those seven independent professionals found no support for concluding that the Plaintiff was functionally impaired, one (Dr. Phifer) rated Plaintiff's impairment at just 5 percent, and one (Dr. Miller) concluded that the Plaintiff was psychiatrically impaired such that gainful employment was not practically feasible. But for Plaintiff's treating physician's persistence in rejecting the views of all of the independent professionals and ignoring the negative findings of objective testing, GLIC likely would have terminated Plaintiff's benefits much sooner. Instead, GLIC persisted until it obtained a well-reasoned clinical explanation for Plaintiff's behavioral issues from an independent source – Dr. Miller. The Plan defines "mental or emotional conditions" as including, but not being limited to, "(a) neurosis; (b) psychoneurosis; ( c) psychosis; (d) psychopathy; and (e) any other

mental or emotional disorder, including those caused by chemical imbalances." [AR 39]. Taking into account all of the evidence, and exercising its discretion to construe the terms of the Plan [AR 43], GLIC determined that the condition that limits the Plaintiff from working in any occupation is a mental or nervous condition within the meaning of the Plan's Special Limitation provision. Because GLIC's interpretation of the Plan's terms is rational, it is entitled to deference. *See Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004) ("We must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants.").

### IV. CONCLUSION

Defendant's decision to terminate Plaint5iff's benefits was neither arbitrary nor capricious. Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Judgment as a Matter of Law be **SUSTAINED**.

This 26th day of August, 2013.



Signed By:
Henry R. Wilhoit, Jr.
United States District Judge